**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| ZOE SPENCER,<br><br>Plaintiff,<br><br>v.<br><br>VIRGINIA STATE UNIVERSITY, *et. al.*<br><br>Defendants. | Case No.3:16cv989<br><br><br>JURY TRIAL DEMANDED |

## **COMPLAINT**

This action arises out of the unlawful employment actions against Plaintiff Zoe Spencer, Ph.D. ("Spencer") by Defendant Virginia State University ("VSU") by and through its Administration and Board of Visitors listed as the other Defendants above (collectively referred to herein as "VSU" or "VSU Administration"). Spencer asserts that she was subjected to, and continues to be subjected to, willful and knowing gender discrimination and retaliation in violation of the Equal Pay Act ("EPA"), as amended, 29 U.S.C. § 206(d), *et seq*. Specifically, Spencer asserts that VSU failed to justly compensate her in violation of the EPA when it discriminated against Spencer on the basis of sex by compensating her at a rate less than the rate at which it pays wages to similarly situated male employees for equal work on jobs, the performance of which required equal skill, effort, and responsibility, and which were performed under similar working conditions. When Spencer attempted to address this gender-based pay disparity, VSU retaliated against her. In support of her Complaint, the Plaintiff Zoe Spencer, by counsel, states as follows:

1

## I. THE PARTIES

1.      Spencer is a resident of the Commonwealth of Virginia.

2.      VSU is a public land-grant university with more than 500 employees that is governed by the Board of Visitors. The Board of Visitors is responsible for controlling and expending funds of the University including its appropriations, appointing the President, establishing tuition and fee costs, appointing faculty and setting their salaries as well as other duties. It is located at 1 Hayden Drive, Petersburg, Virginia 23806.

3.      Dr. Keith T. Miller is the former President of VSU, and served as President until December 31, 2014. He continues to be a tenured faculty member at VSU.

4.      Mr. Harry Black is or was the Rector of VSU's Board of Visitors.

5.      Mr. Willie C. Randall is or was the Vice Rector of VSU's Board of Visitors.

6.      Ms. Daphne Maxwell Reid is or was the Secretary of VSU's Board of Visitors.

7.      Mr. Terone B. Green serves or served on VSU's Board of Visitors.

## II. JURISDICTION

8.      This is an action based on discrimination and willful violation of the EPA, 29 U.S. Code § 206(d). Claims under the EPA may be brought against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees. *Id.* at § 216(b).

9.      Spencer filed a complaint asserting EPA claims against VSU on May 22, 2015, in the Circuit Court for the City of Richmond, Virginia. The state court action was removed to federal court on June 2, 2016. Spencer's EPA claim was dismissed without prejudice on November 30, 2016, allowing her to refile those claims.

10.     Plaintiff filed a Second Amended Complaint

11.     Jurisdiction is proper pursuant to 28 U.S.C. § 1331, as this action involves claims arising out of the Constitution, laws and/or treaties of the United States.

### III. FACTUAL ALLEGATIONS

12.     VSU is subject to the EPA.

13.     Faculty salaries at VSU are set by the VSU Board of Visitors. Pursuant to Virginia Code § 23-165.6, the Board "shall control and expend the funds of the University and any appropriation hereafter provided, and shall make all needful rules and regulations concerning the University, appoint the president, who shall be its chief executive officer, and all professors, teachers and agents, and fix their salaries, and generally direct the affairs of the University."

14.     In addition, according to Administrative Code Title 23, Chapter 13: "The Board of Visitors or other governing body of every state supported institution of Higher Education in Virginia is authorized to establish rules and regulations for...the employment of professors, instructors, and all other employees...of the institution."

15.     Per the bylaws of the VSU Board of Visitors, Section VII: "The faculty and administrators of the University receive recommendations for appointments and renewals by appropriate university officials, and their names, titles and salaries are submitted for approval to the Board of Visitors. Pursuant to the powers vested in the Board by Sections 23-165.6, 23-166 and 23-167 of the Code of Virginia (or succeeding provisions), all faculty appointments and contracts are subject to board policy, rule, resolutions, orders, instruction and these bylaws."

16.     Faculty salaries at VSU are approved by the Board of Visitors based upon

3

the recommendation of the President.

17.    The VSU Board of Visitors has not established an approved and/or published pay scale or pay standard for faculty salaries. There is no published rule or policy that has been approved or published that governs the manner in which faculty salaries are set at VSU.

18.    Faculty salaries at VSU are based on rank and experience, not departmental affiliation or subject matter taught.

19.    VSU employees are divided into Classified Personnel and General Faculty. Any type of faculty member (Assistant Professor, Associate Professor or Professor) is considered to be "General Faculty." General Faculty are then broken down into five categories; "restricted, probationary, term, continuing, or tenure contracts." After faculty have been categorized, their salary is based on their rank and experience as opposed to their department.

20.    Virginia State University is not classified by the Carnegie Classification of Institutions of Higher Education System ("Carnegie") as a Research I, II, or III Institution.

21.    Unlike "research institutions," VSU is an institution wherein instruction of students is the primary responsibility of faculty members, which is reflected by the standard teaching load for faculty members of twelve credit hours per semester.  Typically institutions that are not classified by Carnegie as "Research Institutions," and have standard teaching loads that represent the full time course load of students (as VSU does), are classified as "teaching institutions."

22.    Virginia State University utilizes a standard Employee Work Profile ("EWP") and a standard evaluation tool for all Collegiate/Instructional faculty members in

the College of Education and the College of Humanities and Social Sciences. These establish the "common core" of responsibilities for all Virginia State University employees classified as Collegiate/Instructional faculty.

23.    The common core of responsibilities of each Collegiate/Instructional faculty member in the College of Education and the College of Humanities and Social Sciences include teaching, scholarship, and service.

24.    The various responsibilities of Collegiate/Instructional faculty members in the College of Education and the College of Humanities and Social Sciences at VSU are given the following weights in both the EWP and Faculty Evaluation tool: Teaching- 40-55%; Research/Scholarship- 25-40%; and Service- 15-20%.

25.    The VSU Faculty comparators listed in this complaint (Michael Shackleford and Cortez Dial) are classified as "Collegiate/Instructional faculty." Like Spencer, Dial works in the College of Humanities and Social Sciences within VSU. Shackleford worked in the College of Education.

26.    The College of Humanities and Social Sciences and College of Education were split apart sometime between 2012 and 2014. Prior to that, they were housed within the same school (School of Liberal Arts and Education) within VSU. The split did not affect the responsibilities of faculty members within those colleges.

27.    Collegiate/Instructional faculty are required by the applicable accreditation standards, those of the Southern Association of Schools and Colleges (SACS), to hold a doctorate or master's degree in their teaching discipline, or else a master's degree with a concentration in their teaching discipline (for a minimum of 18 graduate hours in their teaching discipline).   Collegiate/Instructional faculty who teach graduate students are

5

required to have a terminal degree (doctorate) in the teaching discipline.

28.     Appointment as Associate Professor at VSU requires: a terminal degree (e.g., Doctorate, M.F.A., etc.) in the area of teaching specialty, or its recognized equivalent; four years of full-time college/University teaching experience at the Assistant Professor rank or above, or its equivalent; four years of full-time college/University teaching experience at the Assistant Professor rank or above, or its equivalent; evidence of an established high quality of performance in teaching, research/creative activities, and service; and a record should clearly indicate that he/she will be able to meet the University's standards for the award of tenure within the allowed time period.

29.     The full-time workload of every Collegiate/Instructional faculty member at VSU in the College of Humanities and Social Sciences and College of Education consists of a teaching load of twelve semester hours per semester, with exceptions made for course release time granted for approved grant and/or research participation. Notably, there is no difference or distinction in the common core of job requirements between departments or disciplines within these Colleges.

30.     Zoe Spencer, Michael Shackleford and Cortez Dial all had this same standard full-time workload in their positions as Associate Professors at VSU.

31.     Any variations between the teaching, research/scholarship, and service responsibilities of Collegiate/Instructional faculty members in the in the College of Humanities and Social Sciences and College of Education are not departmentally-based, but rather based on faculty member's individual interests and contributions. Any such variations are minor, and do not contribute to salary differences between faculty members.

32.     Faculty at VSU are not evaluated on discipline-specific criteria. In fact,

6

VSU has specifically *declined* to adopt department or discipline-specific workload, salary, promotion, or performance criteria.

33.     The primary responsibility of Collegiate/Instructional faculty at VSU in the College of Humanities and Social Sciences and College of Education is to provide instruction to students.

34.     Collegiate/Instructional faculty at VSU in the College of Humanities and Social Sciences and College of Education engage in a "shared common core of tasks." Every Collegiate/Instructional faculty member in the College of Humanities and Social Sciences and College of Education, regardless of discipline, has the following primary responsibilities.  They must prepare syllabi which reflect course objectives; prepare lessons, activities, and lectures that serve to impart knowledge to students; instruct their students through the use of varying pedagogical methods, such as lectures, technology, practical classroom experiences, group discussion, and media; keep track of whether students are retaining knowledge and meeting the objectives and outcomes of the course through exams, projects, presentations, practical experiences, writing assignments, group work, service, and other activities; manage classroom dynamics; assist students with course material; advise majors; maintain office hours; provide feedback on assignments; input grades midterm and final grades; and attend contractually-mandated functions.  The duties of faculty in College of Humanities and Social Sciences and College of Education are generally performed in a classroom or lecture hall setting in an academic building.

35.     The tasks identified in paragraph 34 were the primary job duties of Michael Shackleford, Cortez Dial, and Zoe Spencer in their roles as faculty members at VSU.

36.     To fulfill their responsibilities, each Collegiate/Instructional faculty

7

member in College of Humanities and Social Sciences and College of Education must study and prepare for class presentations and lectures; present their subject in an interesting and challenging manner; engage in class discussions; prepare tests and exams that fairly cover the subject taught; promptly grade tests and exams; and maintain regular office hours for student consultation and assistance. The effort required of all Collegiate/Instructional faculty members in College of Humanities and Social Sciences and College of Education is substantially the same.

37.    Michael Shackleford, Cortez Dial, and Zoe Spencer and were all required to utilize the skills set forth in paragraph 36 in their roles as faculty members at VSU.

38.    The amount of time spent on research is not a basis for salary differentials set at the time of hire in College of Humanities and Social Sciences and College of Education at VSU. Shackleford and Dial were not paid differently from Spencer based on the amount of time they spent on research. In fact, Shackleford and Dial appear to have conducted no research in their teaching disciplines during their time as Associate Professors at VSU.

39.    VSU does not pay Collegiate/Instructional faculty members teaching academic subjects in College of Humanities and Social Sciences and College of Education on the basis of the particular subject taught. As between men and women teaching academic subjects, the skill, effort, and responsibility required of female Collegiate/Instructional faculty members in College of Humanities and Social Sciences and College of Education is equivalent to that of men.

40.    The task of teaching students in various disciplines requires equivalent skill and responsibility for male and female Collegiate/Instructional faculty members in College

8

of Humanities and Social Sciences and College of Education at VSU.

41.     The skill, effort and responsibility required of Collegiate/Instructional faculty members in the College of Humanities and Social Sciences and College of Education does not differ based on subject matter taught. All Collegiate/Instructional faculty members in these departments perform the same shared common core of tasks. That is, Zoe Spencer, Michael Shackleford and Cortez Dial all performed the same shared common core of tasks.

42.     Spencer is an eligible employee under the EPA and Title VII.

43.     Spencer is a female.

44.     Spencer earned her Master's degree in Social Work in 1992 from Howard University. She earned a Ph.D. in Sociology in 2005, also from Howard University.

45.     Spencer has been employed with VSU since August 2008. She was initially hired as an Assistant Professor in the Department of Sociology, Social Work, and Criminal Justice, and was promoted to Associate Professor in 2010, a position she currently holds. In order to be promoted from Assistant Professor to Associate Professor, an employee must receive of a rating of at least "noteworthy" in teaching effectiveness and at least "noteworthy" in scholarly research or professional service. Spencer has consistently achieved ranks of "outstanding" in the areas of teaching and service, and ranks of "outstanding" and "noteworthy" in scholarship.  Spencer has also received "outstanding" in all categories in Faculty evaluations.

46.     Spencer has over ten (10) years of teaching experience at the University level, with progressive promotions.

47.      Spencer is a member of the Undergraduate and Graduate faculty and is

qualified to teach at the graduate level, mentor, and sit on and advise thesis and dissertation committees both within the University and as an external reviewer/advisor for other institutions.

48.     In Fall 2014, Spencer taught a total of 5 Courses: Sociology of Marriage and Family, a 300-level advanced undergraduate course, with a total enrollment of 54 students (of 50 spots); Ethnic and Race Relations a 300 level advanced course, with a total enrollment of 49 (of 50 spots); Sociological Theory, a 300 level intensive writing graduate school preparation course with a 20-page minimum research requirement and practical application presentation requirement, with a total enrollment of 13 (of 13 spots); African American Women in Society, a 300-level course with an enrollment of 51 (of 50 spots); an overload course for non-traditional students (for additional compensation of 2250.00 per semester); and a 400-level night course for non-traditional students at Ft. Lee Army Base (Sociology of Sports) (9 students enrolled, out of 20 spots).  All in all, Spencer taught 186 students in Fall 2014.

49.     In Spring 2015, Spencer taught a total of 6 courses:  Research Methods in Criminal Justice (a non-paid overload course, in which she covered for colleague) with a total enrollment of 24 (of 25 spots); Marriage and Family,  a 300-level course with a total enrollment of 62 (of 60 spots); Ethnic and Race Relations, a 300-level course with a total enrollment of 50 (of 50 spots); Social Movement and Social Change, a 300-level course with a total enrollment of 56 (of 60 spots), Sociological Theory a 300-level course with a total enrollment of 10 (of 10 spots); and Social Psychology, a 200-level night course for non-traditional students (for additional compensation of 2250.00 per semester) with a total enrollment of 16 (of 20 spots). All in all, Zoe Spencer taught 218 students in Spring 2015.

50.     In Fall 2015, Spencer taught Marriage and Family, with a total enrollment of 49 students (of 50 spots); Ethnic and Race Relations, with a total enrollment of 52 students (out of 50 spots); Sociological Theory, with a total enrollment of 17 students (out of 17 spots); African American Women in Society with a total enrollment of 51 students (out of 50 spots); and Urban Issues, a 300 level night course for non-traditional students (for additional compensation of 2250.00) with a total enrollment of 20 students (out of 25 spots). All in all, Spencer taught 189 students total in Fall 2015.

51.     In Spring 2016, Spencer taught Marriage and Family, with a total enrollment of 63 students (out of 60 spots); Ethnic and Race Relations, with a total enrollment of 61 students (out of 60 spots); Black Feminist Thought, a 400 level advanced course with a total enrollment of 61 students (out of 60 spots); Sociological Theory, with a total enrollment of 14 students (out of 14 spots), and Contemporary Hip Hop and the Prison Industrial Complex, a 400 level night course at Ft. Lee (for additional compensation of 2250.00), with a total enrollment of 21 (out of 25 spots). All in all, Zoe Spencer taught 220 students total in Spring 2016.

52.     In Fall 2016, Spencer taught Problems in the African American Community, a 500 level graduate course with a total enrollment of 4 students (out of 15 spots); Marriage and Family, with a total enrollment of 48 students (out of 50 spots); Ethnic and Race Relations, with a total enrollment of 52 students (out of 50 spots); Sociology of Religion, a 300 level course with a total enrollment of 51 students (out of 50 spots), and Sociological Theory, with a total enrollment of 16 students (out of 16 spots). All in all, Spencer taught 171 students total in Fall 2016.

53.     Spencer currently serves as an external reviewer on a Master's Thesis from

11

Howard University, and an advisor and mentor for a Doctoral Dissertation from Walden University. She has also served on a Thesis Committee for the Department of History and Philosophy at VSU.

54.    In addition to her teaching and advising responsibilities, Spencer continues to research, publish, develop new courses, and give presentations, as well as serve in leadership positions within her department and for the University as a whole. Spencer also provides academic, graduate school, and career advisement for her students. Her student evaluations and her chair evaluations exceed the 95th percentile in each category.

55.    Spencer has engaged in several activities in accordance with the research, scholarship and service aspects of her position, as follows.  Spencer has published 3 books, 2 chapters with another refereed chapter due for publication in 2017;  2 double blind peer-refereed journal articles, with one in progress; presented at 45 professional conferences within and outside of the discipline (to include American Sociological Association, Southern Sociological Society, Association of Black Sociologists, Eastern Criminological Society, Virginia Social Science, Ohio State and Sarah Lawrence Women's History Conferences, and others); participated in continuous community service in regional and local jails, prisons, schools, and communities. Spencer has given over 100 University community presentations, developed courses in Sociology, was instrumental in restructuring the VSU Sociology program curriculum, recently submitted the blueprint for the MA/Ph.D. Program in Sociology to the Department Chair, and contributed to the development of the Certification of Activist Studies.  She served as VSU Faculty Senate Chair for 2011 – 2012, Chair of the Gender Equity Task Force 2012, and Chair of the Joint Committee on Student and Academic Life for Faculty Senate from 2010-2011. She

currently serves as Faculty Senator At Large, from 2014-present. She has received numerous awards and certificates for her service to the VSU community and the community at large, including the NAACP Award for Outstanding Service and most recently a brick in her honor placed at the Women's History Museum at Ft. Lee, Ft. Lee VA. She also wrote, produced, and directed an independent short film titled Epiphany! that was submitted to international film festivals. (Spencer's entire CV is attached as Exhibit C, and incorporated into the Complaint as though fully set forth herein).

56.    Spencer is regarded by students as one of the most revered and respected faculty members on VSU's campus, and consistently receives excellent evaluations from her students. Due to high demand every semester, all of her classes, except for Sociological Theory, fill to capacity (Sociological Theory students must be prescreened and added to the class by the Chair of the Department).

57.    Spencer is currently paid $71,441 per academic year. From 2013 until 2016, her salary was $70,040.00 per academic year. From 2011 until 2013, her salary was $68,500.00 per academic year.

58.    Like Spencer, Michael Shackleford and Cortez Dial are (or were) classified as Collegiate/Instructional Faculty in College of Humanities and Social Sciences and College of Education. Shackleford and Dial's positions as Associate Professors in the College of Humanities and Social Sciences and College of Education require (or required) that they engage in the same common core of tasks as Spencer.

59.    As Associate Professors at Virginia State University, Cortez Dial and Michael Shackleford hold (or held) jobs that require equal skill and effort to Spencer, and have equal job responsibilities and work under similar working conditions. However, each

13

of these men earn significantly higher salaries than Spencer earns, despite actually having equal or less experience and equal or fewer qualifications.

60.     Cortez Dial is an Associate Professor in the Mass Communications Department, which is within the same school as Spencer (the College of Humanities and Social Sciences).

61.     Dial was appointed to this position in Fall 2014 despite the fact that as of the time of hire he did not hold a terminal degree in Mass Communications, as required to teach graduate courses in the discipline. In addition, he did not have a master's degree or doctorate in Mass Communications, as required to teach undergraduate courses by VSU's internal policies, and the regional accreditation body, SACS.  He had no recognized equivalent experience. (Dial's entire CV is attached as Exhibit D, and is incorporated into the Complaint as though fully set forth herein).

62.     In addition, when he was appointed to the rank of Associate Professor, Dial did not have four years of full-time college/University teaching experience at the Assistant Professor rank or above, or its equivalent, or evidence of an established high quality of performance in teaching, research/creative activities, and service. Dial therefore totally lacked qualifications for the faculty position he was appointed to.

63.     Dial does not possess the skill required to teach undergraduate or graduate courses in Mass Communication. Unlike Spencer, Dial does not possess a graduate degree in his teaching discipline, Mass Communication.

64.     Diaz was previously Chief of Staff at VSU, a non-academic administrative position.

65.     Dial did not have experience teaching at the Assistant Professor rank at an

accredited university before being appointed to the rank of Associate Professor at VSU.

66.    Dial's primary duty in his role as Associate Professor at VSU is to teach courses in Mass Communication.  Upon information and belief, he has not engaged in any scholarship or research in the field of Mass Communication.

67.    For Fall 2014, Dial taught Communication Theory and Criticism, a 500-level graduate course with a total student enrollment of 0; Crisis Communication, a 500-level graduate course with a total enrollment of 7; Special Topics in Public Relations, a 500-level graduate course with a total enrollment of 3; and Internship in Public Relations, a 500 level graduate course with an enrollment of 3.  In Fall 2014, Dial taught 13 students in total.

68.    In Spring 2015, Dial taught Special Topics in Mass Communication, a 500 level graduate course with an enrollment of 3; and Graduate Media Internship with an enrollment of 2. In Spring 2015, Dial taught 5 students.

69.    In Fall 2015, Dial taught Introduction to Mass Communication, a 200-level course with a total enrollment of 4; Introduction to Mass Communication, a 200-level course with a total enrollment of 10; Crisis Communication, a 500-level graduate course with an enrollment of 7; Graduate Media Internship I, a 500-level graduate course with an enrollment of 3. In total, Dial taught 24 students in Fall 2015.

70.    In Fall 2016, Dial taught Introduction to Mass Communication, a 200-level course with an enrollment of 17; Media Management, a 500-level graduate course with an enrollment of 17; Crisis Communication, a 500 level graduate course with a total enrollment of 10; and Media Internship, a 500-level graduate course with a total enrollment of 1. In total, Dial taught 45 students in Fall 2016.

71.     Based on requirements established VSU's own policies and the State accrediting body (SACS), Dial does not meet the required minimum qualifications established for an Associate Professor position at VSU.

72.     In establishing "effort and responsibility," a comparison of the teaching load/workload between Dial and Spencer reveals that Dial has taught the same or fewer classes than Spencer every year he has been at VSU. In the past four semesters, Dial has taught 15 courses where Spencer has taught 20. Spencer has also taught many more students than Dial. The number of students enrolled in classes significantly affects the time and effort required to carry out the common core of tasks for professors at VSU, such as grading and evaluating papers, presentations, exams, and assignments; assisting students with material; managing classroom dynamics; calculating and inputting midterm and final grades; and managing discussion and group activities.

73.     Both Spencer and Dial work under the same conditions. They both conduct their classes in lecture halls/classrooms the second floor of Harris Hall at VSU.  They both have offices in Academic Buildings (Colson Hall and Harris Hall) on the campus of VSU.

74.     From 2014 until 2016, Cortez Dial earned approximately $105,446.00 per academic year, or $35,406 more per year than Spencer for work that requires substantially equal skill, effort, and responsibility, and is performed under the same working conditions. He current earns $107,556 per academic year.

75.     Michael Shackleford was appointed to Associate Professor in the Doctoral Studies Department (which is within the School of Education), despite the fact that at the time of hire he did not possess a doctorate or master's degree in his teaching discipline as required by VSU's own policies and the policies of SACS, the regional accreditation body.

16

76.     Before being hired as an Associate Professor at VSU, Shackleford had served as the Vice President of Student Affairs at VSU, a non-academic administrative position.

77.     While Shackleford does have a Doctorate in Education (Ed.D.), his doctorate is in Higher Education Administration from George Washington University. According to the overview of the program in Higher Education Administration at George Washington University that Shackleford completed, "The Higher Education Administration program prepares exceptional leaders for administrative, academic, and research positions in two- and four-year higher education institutions, national and international associations, government agencies, and other post-secondary educational settings."  (Shackleford's entire CV is attached as Exhibit E, and is incorporated into the Complaint as though fully set forth herein).

78.     The College of Education at VSU is specific to Pre-Kindergarten through 12th Grade education (i.e., primary and secondary education, or "PK-12"), and is accredited by NCATE (the National Council of Accreditation in Teacher Education). Its principal mission is to prepare PK-12 teachers and those who wish to pursue Administration and Supervision in PK-12 School Systems in which the Doctoral Program in Administration and Supervision focuses.  Further, achieving levels of Administration and Supervision in PK-12 **requires** experience in PK-12 teaching, praxis examination, certifications, licensure, and endorsements.  Virginia State University does **not** have a program in Higher Education Administration and Leadership, in the College of Education or otherwise.

79.     Thus, Shackleford did not have a terminal degree in his teaching discipline

at VSU (PK-12 education). He has no experience in PK-12 grade education and/or school systems, and does not possess the skill to teach in the Doctoral Program in Education and Supervision in the College of Education at VSU.

80. When he was appointed to the rank of Associate Professor, Shackleford did not have four years of full-time college/University teaching experience at the Assistant Professor rank or above, or its equivalent, at an accredited university in his teaching discipline, or any evidence of an established high quality of performance in teaching, research/creative activities, and service. Shackleford totally lacked qualifications for the faculty position he was appointed to, based on SACS criteria and the University's own policies.

81. On information and belief, Shackleford had previously served as "Professor of Military Science" in the Army War College. This is not the equivalent of teaching at faculty ranks (Assistant, Associate, or Full Professor) in an accredited University in the field of PK-12 education or Doctoral Studies, and does not prepare an individual to teach in an unrelated discipline (PK-12 education or Doctoral Studies) at the University level.

82. Shackleford did not teach any courses in the College of Education in Fall 2014.

83. In Spring 2015 Shackleford was registered to teach Dissertation Education in Administration and Supervision a 700 level dissertation "advisory" course with an enrollment of 1, and another section of Dissertation Education in Administration and Supervision course with an enrollment of 6. In Spring 2015, Shackleford taught 7 students total.

84. Shackleford does not possess the skill required to teach undergraduate or

graduate courses in the College of Education. Unlike Spencer, Shackleford does not possess any sort of degree in his teaching discipline.

85. During the 2014-2015 academic year, Michael Shackleford earned approximately $119,738.00. Spencer earned $70,400.00 during the same time period, or $49,698.00 less, for work that requires substantially equal skill, effort, and responsibility, and is performed under the same working conditions.

86. In addition to violating VSU's own policies, the appointments of Shackleford and Dial from non-academic administrative positions to faculty positions violated widely-held norms of academic hiring. The hiring of these unqualified individuals to faculty positions violated guidelines for faculty hiring adopted by the Southern Association of Colleges and Schools Commission on Colleges, the regional body for the accreditation of degree-granting higher education institutions in the Southern states.

87. As set forth in the attached expert report of B. Robert Kreiser, in American higher education, it is extremely rare for a president or a provost to appoint failed or nonrenewed and well-paid nonacademic administrators with no prior faculty experience (such as Shackleford and Dial) to new faculty positions without appropriate consultation with and vetting by the designated receiving department, and at the same time grant such individuals salaries that are not commensurate with their relevant prior experience and their academic qualifications. Yet that is exactly what happened in this case with respect to Shackleford and Dial: they were appointed to new faculty positions without appropriate consultation with and vetting by the designated receiving department, and at the same time were granted salaries that were not commensurate with their relevant prior experience and their academic qualifications. Mr. Kreiser's Report is attached to the Complaint as Exhibit

19

A, and incorporated into this Complaint as though fully set forth herein.

88.     Mr. Kreiser has forty-seven years of professional experience in American higher education, and is knowledgeable of and familiar with widely accepted faculty personnel policies and particularly with the normative standards of faculty appointment processes and procedures as well as with the standards and procedures relating to institutional accreditation and with the principles of academic freedom. He is a recognized expert on faculty hiring and personnel policies and practices in American higher education. Mr. Kreiser's CV is attached to the Complaint as Exhibit F, and incorporated into this Complaint as though fully set forth herein.

89.     According to a regression analysis performed by Joseph I. Rosenberg, an expert economist, Dial and Shackleford were severely overpaid compared to other faculty members at VSU of similar rank and experience, even when taking into account their differing departmental affiliation. Mr. Rosenberg's Report is attached to the Complaint as Exhibit B, and incorporated into this Complaint as though fully set forth herein.

90.     Mr. Rosenberg is a forensic economist who holds an M.B.A. in Finance, Accounting and Statistics from the University of Chicago and an M.A. in Economics from Virginia Polytechnic University who has over 30 years of experience as an economist and is a widely recognized expert in economics damages calculations. Mr. Rosenberg's CV is attached to the Complaint as Exhibit G, and incorporated into this Complaint as though fully set forth herein.

91.     In 2012, Spencer approached then President Keith T. Miller about the role of gender equity at VSU. As the Faculty Senate Chair, Miller gave Spencer permission to research issues regarding gender equity in pay at VSU and to present findings to

Administration. Spencer served as the chair to the six-member organization entitled "The Gender Equity Task Force." The Task Force presented their findings to the full Administrative Cabinet, including President Keith T. Miller, Provost Weldon Hill, Elliot Wheelan, and Julia Walker in the Spring 2012 semester. The Task Force warned the VSU Administration about the University's potential liability under the EPA and Title VII, recommended the hiring of a Vice President or Ombudsman for Equity, and made further recommendations for addressing the disparity.

92.    Most notably, Spencer found that there were male faculty in the School of Business who had been hired in 2010 with salaries that were extreme outliers to the average salary for their rank, level of experience, merit, and workload. David Coss and Karl Menk had been hired at entry level tenure track Assistant Professors without terminal degrees in Business Administration at salaries of $108,500.00, salaries that surpassed the salary of the highest paid assistant professors within the College by $26,000.00 and surpassed the salaries of other Departments by ranges from $20,000 for the highest paid faculty in the School of Engineering and Technology to greater than $48,000 for the lowest paid faculty in Departments in the School of Liberal Arts and Education, creating gender inequity in pay.

93.    During this presentation, Provost Hill attempted to cast doubt on Spencer's findings. He also attempted to argue that the issue was not important. Spencer admonished the VSU administration's casual dismissal of the issue, and stated that the issue deserved closer study. Instead of engaging the matter, the VSU Administration dismissed the findings and recommendations of the Task Force. It has since continued to willfully and knowingly violate the EPA and Title VII. It now argues that the Gender Equity Task Force

21

never existed.

94.     The Gender Equity Task Force Report revealed that in 2012, Coss and Menk were paid salaries that were higher than every single female professor on a nine month contract at all ranks (Assistant, Associate, and Full) regardless of department affiliation, including those within the College of Business at Virginia State University.  Each man continued to enjoy a salary that created a significant gender disparity from 2012 until Menk departed in 2014 and Coss departed in 2015.  In 2014, Coss still received the same entry level salary of $108,500.00 that he was awarded in 2012.  Having only four years' experience at the rank of Assistant Professor at VSU, Coss' salary exceeded the average salaries for all faculty in all Departments with all years of experience at all ranks, except the rank of Full Professor in the College of Business where Coss' salary was $1665.00 less than the average of Full Professors in the College of Business (who had average experience of 15.3 years, much longer than Coss), making Coss' salary an outlier that cannot be explained by rank, years of experience, or market forces.

95.     Spencer's participation in the Task Force, including presenting the basic findings and complaining about the disparity in pay, amounted to engaging in protected activity under the EPA. For Spencer, it also began a four year period of retaliation by the VSU administration that culminated in the denial of Spencer's own request to be paid equally to her male comparators.

96.     Despite being presented with the Task Force findings in 2012 wherein the task force outlined and presented a similar circumstance where two men, Coss and Menk, were hired at salaries that created a significant disparity for female faculty, in 2014, the VSU Administration willfully and knowingly violated the EPA by appointing two men,

22

Michael Shackleford and Cortez Dial, to the ranks of Collegiate/Instructional faculty at significantly higher salaries than female Collegiate/Instructional faculty at VSU, including Spencer, and then refusing to equalize Spencer's salary to that of her male comparators after she both advised them of the disparity and requested a salary adjustment.

97.     After Spencer's participation on the Gender Equity Task Force and after presentation of the findings and recommendations, Provost Weldon Hill referred to her as a "trouble maker" to other colleagues and began to engage in a pattern of retaliation against Spencer. Provost Hill created a hostile work environment for Spencer in retaliation for her Gender Equity complaints.

98.     In September 2012, the faculty Board Representative presented the BOV with a statement about gender equity in pay.  In addition, in the months after she gave her Gender Equity presentation, Spencer engaged in discussions with Board of Visitors Member Terone Green regarding gender inequality and retaliation at VSU, to the dismay of Provost Hill and President Keith T. Miller.

99.     In May 2012, following Spencer's Gender Equity Task Force presentation, Provost Hill intentionally delayed signing Spencer's paperwork for her Summer School pay, resulting in a delay of her pay which caused significant financial hardship.  Provost Hill did this intentionally, due to retaliatory animus against Spencer for her Gender Equity Task Force Presentation.

100.     In December 2012, following Spencer's communications with Green about the issue of gender inequity in pay at VSU after the November 2012 board meeting, Provost Weldon Hill refused to sign Spencer's time sheet in a manner that would have afforded her the opportunity to be paid in time for the holiday break, even after she made repeated

23

requests over the course of several weeks. In email correspondence that began in early December, Spencer was informed by all parties that her paperwork has reached Provost Hill's office for signature; however, Hill refused to sign the paperwork and instead lied to Spencer about having already signed it in order for her to get paid. For three pay periods, Spencer did not receive her overload pay that was contractually due to her on December 14, 2012. This resulted in her getting paid three pay periods late, on January 15, 2013. This delay caused financial hardship and a 30-day credit delinquency. The actions by Provost Hill in delaying Spencer's paperwork and then lying to her about it were intentional and were motivated by retaliatory animus against Spencer for having engaged in the protected activity of the Task Force.

101.    In the early afternoon of July 30, 2013, in a lengthy message addressed to Dr. Hill and several other members of the administration, Professor Spencer complained about the lack of security of faculty members' tenure and promotion dossiers that were being kept in an office in the provost's suite. Her complaint was prompted by the fact that erroneous information about her credentials, specifically the status of her licensure as a clinical social worker, was obtained from her dossier by a private party and used to register an anonymous complaint against her, later proved false, that resulted in an investigation and an audit of her credentials. At the end of her message she suggested that in the future, "all Dossiers be kept in a locked office or file cabinet that is only accessible to the individual who will return them to the owner while awaiting pick-up in the future. This will protect the University, ensure a secure chain of command, and maintain the integrity of the tenure and promotion process for all faculty."

102.    In an e-mail response written little more than an hour later, Provost Hill, after

24

stating his "intention to make the process digital, thus improving the security of the dossiers," took exception to Professor Spencer's insinuation "that the breach [sic] occurred in the Academic Affairs Office," whereupon Professor Spencer wrote another message, less than two hours later, clarifying that "By NO MEANS . . . am I insinuating that 'the' or a breach happened in 'your area' or any other." She added: "I am merely and humbly suggesting that, until we move to digital, they be placed in a secured area to avoid unauthorized access or even the perception of the possibility of unauthorized access in the future." Her reply did not mark the end of the exchange. At 10:30 that night the provost, seemingly quite agitated, responded again, chastising Professor Spencer: "At the end of the day, . . . it's more of the same—me spending precious hours trying to defend myself and my staff—writing lengthy responses to IA [Internal Audit] and fielding calls from board members about it—when in fact there is no malfeasance. While I appreciate the note of emphatic clarification, it does not un-ring the bell for those who will use anything to tarnish the reputation [of] my staff and me based upon nothing more than personal animus. I do not understand, but I have become accustomed to the tactic."

103.    Just after midnight, Professor Spencer wrote back: "I know that anything that I say and/or do in my own defense will be construed as a tactic that you believe I am using to tarnish you. I wish we could go back and change the direction that things took. But I can't. . . . I simply want to make sure that what happened with my Dossier, and the use of an anonymous hotline complaint to negotiate any personal issues with me is not utilized again. I simply want to make sure records are protected. I guess your sentiment about me doesn't afford you to see the value in the suggestion made."

104.    Later that morning Provost Hill responded: "Now, I have to do a ton of

stupid busy work for nothing. You could just as easily have pulled me aside and said, 'Maybe you could do it this/that way.'  But, as usual, you go public and then . . . claim good intentions in the end. A wise person taught me a long, long time ago, that, 'If you get dragged into a game you do not wish to play, then play the end-game.'" This was, of course, a veiled threat against Spencer—if she continued to voice concerns about Provost Hill and the administration, she could expect further retaliation.

105.    In May 2013, one of Spencer's students received a failing grade in her Sociological Theory class. After she and her family contacted the Provost's Office (i.e., Provost Hill's office) to complain about Spencer's failure to give an "Incomplete" or a passing grade that was not deserved, the student was encouraged by the Provost's Office\ to file a formal discrimination complaint against Spencer with the Office of Civil Rights. This student had received failing grades in her other classes, but was encouraged by the VSU Administration to only file a complaint only against Spencer.

106.    Neither Provost Hill nor the Associate Provost in his office informed Spencer of the student's complaint, or advised the student to follow the chain of command for student complaints and/or grade appeals, as is customary.  They further did not advise the student or her mother that the student had failed to file the appropriate notification and accommodation paperwork with the Students with Disabilities Office, and thus did not follow VSU guidelines required for seeking an accommodation request. Thus, the Administration *knew* that Spencer had no knowledge of the student's disabilities, or any requested accommodations. Moreover, the University's EEOC Director and University Counsel refused to represent Spencer in this matter, forcing Spencer to negotiate directly with the Office of Civil Rights in order to favorably resolve the issue. As a result, Spencer

26

was forced to go through a lengthy and intense investigatory process, which involved an interrogation, calls to all of Spencer's students questioning Spencer's teaching methods and integrity, without any support from the University. This served to undermine her reputation and character and caused Spencer a great deal of stress and duress. This investigation lasted approximately two months. This targeting of Spencer and failure to support her by the VSU Administration was motivated by retaliatory animus against Spencer for having engaged in the protected activity of the Task Force. In 2014, Provost Hill allowed this student to participate in commencement activities without having completed her degree requirements, and the student has not since returned to complete them.

107.    As a result of the extreme tension experienced by the escalating patterns of retaliation, in July 2013, Spencer applied for a position to teach abroad in China in order to "get away" from the retaliatory animus of Weldon Hill.

108.    In November 2013, while still in China, Spencer received an email from the Chair of her Department informing her that Provost Weldon Hill had denied Spencer the opportunity to teach her regular additional course at Ft. Lee, for which she receives additional compensation. Spencer emailed Hill to question his rationale and demand he provide justification. Spencer complained that if "he simply did not want her to teach, he should simply state that so she can move forward." In the email chain, Hill said that he does not agree with "some of Spencer's approaches" and "realizes that Spencer is "going to do as you please my own preferences notwithstanding." After Spencer contested the denial and confronted Hill, the course was eventually reinstated. The actions by Provost Hill while Spencer was still in China constituted another action in furtherance of Hill's

27

retaliatory animus against Spencer for having engaged in the protected activity of leading the Task Force and escalating her complaints about pay equity to the BOV.

109.    In an email in February 2014, during an email exchange where Spencer was discussing faculty concerns about a block schedule with Hill, Hill responded in an email, before explaining his position, "at the risk of this becoming a problem for me down the line….the trust issue again… no offense intended."  He then said to Spencer, "**It is nearly impossible to get people to improve upon what we have by simply looking in the mirror…Instead we have to be consumed with protecting ourselves or competing for different jobs** because of the pervasive personal attacks, animus, disdain, and hatred amongst us all…"  (emphasis added). This was a clear reference to Spencer's complaints about gender-based pay inequities at VSU, and an admission that Hill harbored retaliatory animus towards Spencer.

110.    In April 2014, after the Board of Visitors did not approve the contract renewal of Michael Shackleford in his role of Vice President of Student Affairs amidst formal complaints of sexual harassment, the VSU Administration, with the approval of the Board, willfully and knowingly created and assigned Shackleford to a Collegiate/Instructional faculty position at the rank of Associate Professor in the Department of Doctoral Studies. This transfer appointment disregarded the fact that Administration was fully aware that Shackleford did not have a terminal degree in the discipline appropriate for his instructional duties, did not have four years teaching experience at the University level at the rank of Assistant Professor or higher, and did not have other experience that would qualify him to perform at the Associate Professor level. In 2014, upon the recommendation of Provost Hill and President Keith T. Miller, VSU

28

willingly and knowingly approved a salary of $119,734.00 per academic year for Shackelford, which was $49,698.00 more per year than Spencer earned during the same time period, and more than the other female Collegiate/Instructional faculty at VSU the same rank.

111.   In April 2014, after the Board of Visitors did not approve the contract renewal of Cortez Dial in his role of Chief of Staff, the VSU Administration, with the approval of the Board, willfully and knowingly created and assigned Dial to a collegiate/instructional faculty position at the rank of Assistant Professor in the Department of Mass Communication. This placement disregarded the fact that Dial did not have a terminal degree in Mass Communication, did not have a terminal degree in the discipline appropriate for his instructional duties, did not have four years teaching experience at the University level at the rank of Assistant Professor or higher, and did not have other experience that would qualify him to perform at the Associate Professor level. Upon the recommendation of Provost Hill and President Keith T. Miller, the Board of Visitors willingly and knowingly approved a salary of $105, 446.00 for Dial, which was $35,406.00 more per year than Spencer earned during the same time period and more than the other female collegiate/instructional faculty at VSU as same or higher rank.

112.   In June 2014, Spencer began the process of requesting a salary adjustment through the administrative chain of command, beginning with the Provost and President, to equalize her pay along with an amendment to her contract in accordance with the EPA/Title VII, especially given the higher pay of Shackelford and Dial.  In her requests, Spencer complained that the appointments of Shackleford and Dial violated established guidelines for faculty hiring and reflected gender discrimination against female faculty

members. The request was supported by Spencer's Department Chair, Dr. Joyce Edwards, but was denied by Provost Hill.   The request was then submitted to the Board of Visitors, where Spencer again raised concerns about gender inequality. However, Spencer's pay was not increased and VSU continued to keep Spencer at a disparate rate of pay while lesser qualified males were paid more or were hired and/or promoted and paid more.

113.    On April 13, 2015, Spencer filed a formal charge of discrimination and retaliation in violation of Title VII with the Equal Employment Opportunity Commission. This was protected activity under the EPA.

114.    On May 22, 2015, in the Circuit Court for the City of Richmond, Virginia, Spencer filed her initial Equal Pay Act Complaint against VSU and several of its employees in their official capacities as Plaintiff's employers. This was protected activity under the EPA.

115.    On May 27, 2015, shortly after both of these protected activities, Spencer requested information from Ms. Julia Walker, EEO/Compliance Manager regarding an unrelated action.  She was informed by Ms. Walker that she would need to make all requests through her attorney, even though it was a matter unrelated to her EPA lawsuit and EEOC charge.

116.    In the following months, VSU, specifically Hill, continued to retaliate against Spencer for exercising her right to pursue legal remedies for discrimination by using that as a reason to block communication to and from her on unrelated matters, informing new Presidents and Administrators about her lawsuit and her being a "troublemaker" in an attempt to discredit and ostracize her and to promote animus toward her by new Administrators for exercising her right to pursue remedy for gender

30

discrimination.

117. Spencer brought her complaints to the attention of President Keith Miller and Provost Weldon Hill, and followed the administrative chain of command with regard to the pay inequities, bringing her complaints to the HR Director, EEOC Director, Dean, Chair, and the BOV Chairs of the Human Resources and Academic Affairs committees, with no relief or corrective action taken. In the Spring of 2015, she sent a demand for relief to the VSU Administration, but no corrective action was taken. She also filed her EPA lawsuit but did not serve it for nearly one year, during which time period the Defendants were made aware of the lawsuit but failed to take any remedial action.

118. In August 2015, Spencer, through her Chair and chain of command, submitted a threat assessment for "stalking" to University Counsel, Ramona Taylor, in accordance with VSU Policy 1101: J: 1,2,4 and 6 regarding a troubled student who was "stalking" Spencer. Spencer requested that the VSU Administration address the issue and that the student refrain from taking Spencer's courses.  The VSU Administration did not respond to Spencer's letter or concern at all, forcing Spencer's Departmental Chair to teach the course in which the student was enrolled.

119. In January 2016, Spencer was removed from her role of giving the Freshman Orientation speech during Freshman Orientation week that she had done for the preceding three years (or six semesters).  When her name was removed from the schedule, she was informed by the student organizers that the VSU Administration had taken her off of the program with no explanation.

120. The incidents of retaliation against Spencer are continuing in nature, and amount to a continuing violation of the EPA. The retaliatory character of the acts become

clear when viewed later acts are viewed cumulatively in light of earlier acts.

## III. LEGAL CLAIMS

### COUNT I –VIOLATION
### OF THE EQUAL PAY ACT

121.    Spencer re-alleges each and every allegation contained in the preceding paragraphs with the same force and effect as if they were fully set out herein.

122.    Based on the foregoing, it is clear that Spencer has been paid less than her male comparators for equal work which requires equal skill, effort, and responsibility, and which is performed under similar working conditions

123.    Such pay discrepancies are not based on a seniority system, a merit system, a system which measures earnings by quantity or quality of production, or any other factor other than sex.

124.    VSU has known about their liability under the EPA since Spencer chaired the Gender Equity Task Force in 2012. Their complete dismissal of the Task Force's findings and recommendations and ongoing failure to correct the inequities despite being on continued notice of the inequities clearly makes their EPA violations willful and knowing.

125.    The violations, in pay and benefits especially, have been willful, knowing, and repeatedly occurring with every paycheck Spencer has received since 2014.

126.    Since VSU's violations of the EPA have been willful, Spencer is entitled to a three-year statute of limitations on her claims and to liquidated damages, in accordance with 29 C.F.R. 1620.33(b).

### COUNT II –RETALIATION IN VIOLATION OF THE EQUAL PAY ACT

127.    Spencer re-alleges each and every allegation contained in the preceding

32

paragraphs with the same force and effect as if they were fully set out herein.

128.    Spencer has been willfully retaliated against since 2012 after her participation in the Gender Equity Task Force and her vocal findings and recommendations regarding fixing the pay inequities between male and female faculty by keeping Spencer at a disparate rate of pay compared to lesser qualified comparators, despite her requests for a pay increase.

**COUNT III –WILLFUL AND KNOWING VIOLATION OF THE EQUAL PAY ACT**

129.    Spencer re-alleges each and every allegation contained in the preceding paragraphs with the same force and effect as if they were fully set out herein.

130.    VSU has known about their liability under the EPA since Spencer chaired the Gender Equity Task Force in 2012. VSU was thoroughly informed of the manners in which the appointments of Shackleford and Dial further violated the EPA and Title XII in her complaint and request for equal pay to her male counterparts in each written notification. Their complete dismissal of the Task Force's findings and recommendations in 2012, their continuing to keep female faculty at a disparate rate of pay since being put on notice of disparities in 2012, their 2014  appointment of Shackleford and Dial at significantly higher rates of pay than all female employees at VSU, and VSU's ongoing failure to correct the inequities despite being on continued notice of the inequities clearly makes their repeated EPA violations willful, knowing, and blatant.

131.    The violations, in pay and benefits especially, have been willful, knowing, and repeatedly occurring with every paycheck Spencer has received since 2012.

132.    Since VSU's violations of the EPA have been willful, Spencer is entitled to a three-year statute of limitations on her claims and to liquidated damages, in accordance

33

with 29 C.F.R. 1620.33(b).

133.    The EPA also provides increased civil penalties for incidents of "willful" or "repeated" violations. 29 U.S.C. § 216(B)(2).

## IV. PRAYER FOR RELIEF

134.    As a proximate result of the conduct of VSU as set forth in all the preceding paragraphs, Spencer was damaged.

135.    For violations of the EPA, Spencer demands such legal or equitable relief as provided by law, including, but not limited to, the following:

    a.    A preliminary and permanent injunction against VSU and its directors, officers, employees, agents, successors, employees and representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, improper activities and practices, policies, customs and usages as set forth herein;

    b.    Front pay in a to be determined amount;

    c.    Back pay in the amount of $101,848, plus interest on that monetary award;

    d.    Liquidated damages (double back pay) on any monetary award under the EPA;

    e.    Reasonable attorney fees and costs in bringing this action;

    f.    Prejudgment interest; and

    g.    Any other relief that this Court deems just and equitable.

## VI. MISCELLANEOUS

136.    Trial by jury is demanded.

137.    Plaintiff reserves the right to amend this Amended Complaint, including the right to add additional counts and/or parties through discovery and up to trial of this action as investigation and discovery further warrant.

WHEREFORE, the plaintiff, Zoe Spencer, is seeking damages in an amount to be demonstrated by the evidence up to the sum of ONE MILLION FIVE HUNDRED THOUSAND DOLLARS ($1,500,000.00) in compensatory damages including but not limited to back pay and front pay and double back pay as liquidated damages, THREE HUNDRED THOUSAND DOLLARS in punitive damages, her attorney fees and costs and such other relief as the Court and/or jury may award.

Dated: December 19, 2016                Respectfully submitted,


/s/ Kermit A. Rosenberg
_____
Kermit A. Rosenberg (VSB No. 14975)
BAILEY & EHRENBERG PLLC
1015 18th Street, N.W.
Suite 204
Washington, D.C. 20036
Tel:  (202) 331-1331
Fax:  (202) 318-7071
krosenberg@becounsel.com

**Counsel for Plaintiff**