IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

ZOE SPENCER,                          )
                                      )
                Plaintiff,            )
                                      )
v.                                    )        Civil Action No. 3:16cv989–HEH
                                      )
VIRGINIA STATE UNIVERSITY,            )
*et al.*,                             )
                                      )
                Defendants.           )

## <u>MEMORANDUM OPINION</u>
### (Granting Motion for Summary Judgment)

Plaintiff Dr. Zoe Spencer ("Plaintiff") filed this suit against Defendant Virginia State University ("VSU") and Defendant Dr. Keith T. Miller ("Dr. Miller") (collectively "Defendants"), alleging that Defendants violated the Equal Pay Act, 29 U.S.C. § 206(d), *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, in the course of various employment actions taken against Plaintiff. (2d Am. Compl., ECF No. 44.) This matter is now before the Court on Defendants' Motion for Summary Judgment (ECF No. 74), filed on October 24, 2017.

All parties filed memoranda supporting their respective positions. (ECF Nos. 76–78.) The Court dispensed with oral argument because the facts and legal contentions were adequately presented in the materials before it, and oral argument would not have aided in the decisional process. E.D. Va. Local Civ. R. 7(J). On November 28, 2017, the Court issued an order granting Defendants' motion and dismissing Plaintiff's action with prejudice (ECF No. 87), and further identified that the Court would subsequently file a memorandum opinion explaining its reasoning. This reasoning is set forth below.

1

# I.    BACKGROUND

At the outset, the Court notes that Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Memorandum in Opposition," ECF No. 77) fails to include a specifically captioned section listing all material facts as to which she contends are genuinely in dispute, as required by E.D. Va. Loc. Civ. R. 56(B)[1] and consistent with Fed. R. Civ. P. 56(c)(1). Instead, Plaintiff has set forth her own version of the material facts without identifying the facts among those cited by the Defendants that she disputes. Under the Local Rules, a court in this situation may accept those facts identified by the movant as undisputed to be admitted, as well as assume admitted those facts not disputed by reference to the record. E.D. Va. Loc. Civ. R. 56(B); *see JDS Uniphase Corp. v. Jennings*, 473 F. Supp. 2d 705, 707 (E.D. Va. 2007). Despite Plaintiff's failure to comply with the plain language of Local Rule 56, the Court has made a reasonable effort to discern which material facts are genuinely disputed by examining the citations to the record in Plaintiff's Memorandum in Opposition. Where appropriate, however, the Court reserves the right to consider Defendants' statement of facts as undisputed, as permitted by the Local Rules and Fed. R. Civ. P. 56(e).

---

[1] Local Rule 56(B) provides:

> Each brief in support of a motion for summary judgment shall include a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue and citing the parts of the record relied on to support the listed facts as alleged to be undisputed. *A brief in response to such a motion shall include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute.* In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

E.D. Va. Loc. Civ. R. 56(B) (emphasis added).

The Court has concluded that the following factual recitation represents the undisputed

material facts for the purpose of resolving the summary judgment motion:

VSU is organized into six colleges, which are further divided into various departments.

(Palm Decl. ¶ 12, ECF No. 76-1; Kanu Decl. ¶ 5, ECF No. 76-2.)  Two of the six colleges are

the College of Education and the College of Humanities and Social Sciences.  (Palm Decl. ¶

12.)

The College of Education focuses on the preparation of educational professionals.

(Corley Decl. ¶ 4, ECF No. 76-3.)  It is divided into five departments, including the

Department of Educational Leadership, which is a combination of the former Department of

Administrative and Organizational Leadership and the Department of Doctoral Studies.  (*Id.*

¶ 6.)  The Department of Educational Leadership's senior-level preparation program aims to

teach students how to lead a school that is both effective and efficient.  (*Id.* ¶ 7.)  Further, the

department's doctoral program allows as many as twelve graduate-level students to pursue a

Doctorate in Educational Administration and Supervision.  (*Id.*)

The College of Humanities and Social Services is divided into nine departments, two

of which are the Department of Sociology and Criminal Justice ("Sociology") and the

Department of Mass Communications and Communications Services ("Mass

Communications").  (Kanu Decl. ¶¶ 5–6, 8.)  The Department of Sociology contains both

bachelor's and master's degree programs.  (*Id.* ¶ 7.)  The Department of Mass

Communications allows students to specialize in several areas, including public relations.  It

offers a Bachelor of Arts in Mass Communications, which requires all students to complete

an internship in a professional setting.  (*Id.* ¶ 9.)  Further, the Department of Mass

Communications promotes the professional expertise of its faculty and staff in numerous

areas including public relations. (*Id.* ¶ 11.)

Plaintiff earned her master's degree in Social Work in 1992 and earned her Ph.D. in Sociology in 2005, both from Howard University. (2d Am. Compl. ¶ 37.) She began as an Assistant Professor in the Sociology Department at VSU in 2008 before she was promoted to Associate Professor in 2010 and granted tenure in 2013. (*Id.* ¶ 38; Spencer Dep. 115:8–10, ECF No. 77-10.) In the fall of 2013, VSU allowed Plaintiff to teach in China for a semester, during which time she received her regular salary and a $10,000 stipend. (Spencer Dep. 313:19–315:2; 2d Am. Compl. ¶ 101.) Provost Weldon Hill was among the individuals at VSU that signed off on both Plaintiff's tenure and her request to teach abroad. (Spencer Dep. 115:11–20, 314:15–315:2.) Plaintiff was promoted to Full Professor in 2017. (*Id.* at 213:10–12.)

From 2011 to 2013, Plaintiff's salary was $68,500 per academic year. (2d Am. Compl. ¶ 50.) Plaintiff's salary increased to $70,040 from 2013 to 2016. (*Id.*) Her current salary as a full professor is $71,441. (*Id.*) Amongst the salaries for the other full professors in the Sociology Department, Plaintiff's salary is the same as that of one male professor, higher than those of one male and one female professor, and lower than those of one male and one female professor. (Spencer Dep. 218:11–219:4.) During her time as an Associate Professor, Plaintiff's salary similarly fell in the middle of the salaries of her colleagues at the same rank. (Kanu Decl. ¶ 13.)

Throughout her tenure at VSU, Plaintiff has taught several different undergraduate courses in the Sociology Department, such as Sociology of Marriage and Family, Social Psychology, and Contemporary Hip Hop and the Prison Industrial Complex, and one graduate-level course. (2d. Am. Compl. ¶¶ 41–45.) Plaintiff estimates that she works

4

approximately thirty hours per week. (Spencer Dep. 52:2–9.) Plaintiff has never served in an administrative capacity either at VSU or any other entity. (*Id.* at 240:1–2.)

In 2014, VSU denied Plaintiff's request for her salary to be raised to the pay-level of Colonel Cortez Dial and Dr. Michael Shackleford. (Hill Dep. 267:17–269:4.) VSU made this decision after determining that Plaintiff's salary was in the middle of those similarly ranked professors within her department. (*Id.*) Dr. Joyce Edwards, the chair of Plaintiff's department, recommended that Plaintiff receive a salary increase. (Edwards Dep. 164:21–165:16.) However, Dr. Edwards acknowledged that the denial was likely due to VSU's concern that increasing Plaintiff's salary would lead to a domino effect amongst all faculty members at the associate professor rank. (*Id.*)

Dial's educational background includes a Bachelor of Science degree in Communication Science from Northern Illinois University in 1974, a Master of Science degree in Education from University of Southern California in 1978, a MBA from Webster University in 1985, and a Doctorate in Education from VSU in 2013. (Dial Dep. 14:8–13, 164:21–165:15; Exs. 1–4, ECF No. 76-6.) Dial joined the Army in 1974, and during his service he held several different positions in public affairs and personnel. (*Id.* at 47:1–6; Def. Supp. Resp. 1st Int. ¶ 15, ECF No. 76-7.) He was promoted to full colonel in 1997 before ultimately retiring in 2003. (Dial Dep. 47:7–8, 132:16–18.)

Following Dial's retirement from the Army, VSU hired him as Director of Residence Life. (*Id.* at 21:8–11.) In 2004, Dial began serving as VSU's Chief of Staff, and he held that position until June 2014. (*Id.* at Ex. 6.) As Chief of Staff, Dial fulfilled several administrative and supervisory roles under the direction of VSU's president. (Def. Supp. Resp. 1st Int. ¶ 8.) During his time as Chief of Staff, Dial also taught several courses at VSU

such as an undergraduate course in mass communications and a graduate-level course titled Crisis Communications. (Dial Dep. 160:1–4, 160:22–162:3.) In the summer of 2013, Dial informed the President of VSU that he intended to step down as Chief of Staff to pursue teaching opportunities. (*Id.* at 170:6–12.)

After Dial announced his interest in teaching, the Chair of the Mass Communications Department, Dr. Ishmail Conway, approached him and said "We'd really like you to stay here for one more year at least." (*Id.* at 170:13–22.) Ultimately, Dial accepted a position as a term-appointed Associate Professor in the Mass Communications Department. (*Id.* at 170:6–14, 192:15–18; Kanu Decl. ¶ 14.) The position came with a nine-month contract that paid $105,446, which was 75% of the twelve-month salary he received as Chief of Staff. (Def. Supp. Resp. 1st Int. ¶ 6.) From 2016 to 2017, his salary increased to $107,556. (2d Am. Compl. ¶ 67.) Dial's salary as a term appointment exceeded the salaries of many tenured faculty at VSU, male and female, and it was higher than that of all other faculty within the Sociology Department. (Kanu Decl. ¶ 14.)

From 2014 to 2017, Dial taught six semesters of courses at both the undergraduate and graduate levels, such as Crisis Communications, Graduate Media Internship, Media Management, and Special Topics in Media. (2d Am. Compl. ¶¶ 60–63.) Dial also performed tasks such as advising students and assisting student groups, promoting the Mass Communications Department to Army Logistics University at Fort Lee, working with the NCO academy at Fort Lee, and serving as the coordinator of the Mass Communications Department Internship Program. (Dial Dep. 186:19–189:4; Def. Supp. Resp. 1st Int. ¶ 20.) In this capacity, he helped create an internship with Minor League Baseball, and further developed, maintained, and reviewed internship sites. (Dial Dep. 189:1–2; Def. Supp. Resp.

1st Int. ¶ 20.)  Dial left the faculty at the end of the 2017 academic year.  (Dial Dep. 237:12–18.)

Shackleford's educational background includes a bachelor's degree in Business Administration from VSU in 1972, a MBA from Florida Institute of Technology in 1977, and a Doctorate in Education from George Washington University in 2003, which included completing a dissertation on the "Impact of Remedial Math on Retention and Graduation Rates at an HBCU." (Shackleford Dep. 13:9–15, 16:8–9, ECF No. 77-11.)  Shackleford served in several leadership positions in the Army prior to retiring in 1996.  (*Id.* at 33:16–35:9, 55:5–11.)

Following his retirement from the Army, Shackleford joined VSU as Executive Director of Enrollment Management where he worked to grow enrollment through recruitment and retention.  (*Id.* at 55:1–4, 19:9–14.)  In 2004, Shackleford became the Associate Vice President for Student Affairs and Enrollment Management and later the Vice President for Student Affairs and Enrollment Management.  (*Id.* at 36:22–37:11.)  In that position, Shackleford oversaw several components of the VSU administration including the division related to Judicial Affairs/ Student Conduct, Residence Life, Student Counseling, and Student Organization/ Greek Life.  (Def. Supp. Resp. 1st Int. ¶ 14.)

In early 2014, Shackleford indicated that he wanted to pursue teaching or work in another capacity at VSU.  (Shackleford Dep. 113:16–199:8.)  Defendant Dr. Miller, then-president of VSU,[2] approached Shackleford about remaining at VSU in order to help change the student culture.  (*Id.* at 115:3–116:4.)  Ultimately, Shackleford accepted a position as a

---

[2] Dr. Miller served as President of VSU from July 2010 to December 2014.  (Palm Decl. ¶ 9.)

term-appointed Associate Professor in Doctoral Studies for the 2014–2015 school year. (Shackleford Dep. 123:1–124:2, 184:3–12; Hill Dep. 88:8–20, ECF No. 77-8.) The position came with a nine-month contract that paid $119,738, which was 75% of the twelve-month salary he received in his administrative position. (Shackleford Dep., Ex. 9, ECF No. 76-9; Hill Dep. 114:17–115:18.) Shackleford's salary as term-appointed Associate Professor in Doctoral Studies exceeded that of many tenured faculty at VSU, both male and female. (Corley Decl. ¶ 8.)

Shackleford taught students at the graduate level, specifically in the education administration doctoral program. (Shackleford Dep. 124:16–126:2, 188:18–21.) One of his primary tasks was to reduce the backlog of doctoral students that had formed due to understaffing. (*Id.* at 125:3–7.) In this capacity, he helped steward doctoral students through the dissertation phase of their degree, which involved helping with selecting dissertation topics, planning the collection of research data, and providing feedback and guidance to assist with completion of the students' dissertation defense. (*Id.* at 188:19–21.) Additionally, he served as the co-coordinator for the College of Education Internship Program and as a recruitment officer for the Department of Doctoral Studies, which involved making presentations at schools across the state. (*Id.* at 184:3–12; 217:13–21; Def. Supp. Resp. 1st Int. ¶ 21.) Given these various commitments, Shackleford's typical day ran from 9 a.m. to 10 p.m. and often required working seven-day weeks. (Shackleford Dep. 147:2–16.)

The procedures followed in hiring both Dial and Shackleford deviated from the procedure typically utilized by VSU, but VSU had a practice of prorating the salary of an administrator to a nine-month salary when that administrator moved to the faculty. (Hill Dep. 80:1–4, 115:1–6, 140:9–22; *see also* Mem. Opp. Sum. J. ¶ 19.) VSU utilized a "simple

arithmetic calculation" in setting the salaries of Shackleford and Dial as Associate Professors at 75% of their prior salaries as administrators. (Hill Dep. 272:9–15, 277:8–11.) Further, Provost Hill believed that this practice was followed by institutions of higher education across the Commonwealth. (Def. Supp. Resp. 1st Int. ¶ 6.) A regression analysis performed by Dr. Joseph I. Rosenberg found that both comparators were paid more than their similarly situated peers—both male and female. (Rosenberg Dep. 79:10–21, ECF No. 76-10.) Further, Dr. Rosenberg's analysis did not show pay disparity at a "statistically significant level of males over females by school." (*Id.* at 183:13–184:10.)

In addition to her claims of an illegal pay disparity, Plaintiff claims that Defendants took actions that constituted retaliation in violation of the EPA and Title VII. Plaintiff presented the VSU administration with a report on gender-based pay inequity at VSU in April 2012 and further gave a copy of the report to VSU Board Member Terone Green in November 2012. (Spencer Dep. 254:19–255:15.) Following Plaintiff's presentation, the VSU administration took various steps to further investigate and resolve the concerns highlighted by the report, including allotting over $450,000 for pay increases. (Hill Dep. 182:19–183:4, 185:10–15.)

The majority of the alleged materially adverse employment actions involve VSU's Provost, Weldon Hill. (*See generally* 2d Am. Compl.) Plaintiff alleges that in May 2012 "Provost Hill intentionally delayed signing [Plaintiff]'s paperwork for her Summer School pay." (2d Am. Compl. ¶ 92.) The delay was caused by Plaintiff's department chair missing a submission deadline due to inadvertently overlooking an email. (Hill Dep. 195:17–19.) In an attempt to accommodate Plaintiff and expedite her receipt of payment, the President of VSU

suspended electronic deposit for everybody so that paper checks could be picked up. (Hill
Dep. 196:3–5.)

Plaintiff alleges that in December 2012, "Provost Weldon Hill refused to sign
[Plaintiff]'s time sheet in a manner that would have afforded her the opportunity to be paid in
time for the holiday break." (2d Am. Compl. ¶ 93.) In response to a board member inquiring
about this delay, Provost Hill made derogatory comments about Plaintiff. (Green Dep.
100:10–101:15, ECF No. 77-13.) In the past, Hill had signed paperwork preferentially.
(Edwards Dep. 139:7–11, ECF No. 77-9.) VSU and Hill also had a general culture of
retaliation if you got on their bad side. (*Id.* at 183:1–5.) A lengthy email exchange identifies
that the initial delay in Plaintiff's payment was due to her department chair, Joyce Edwards,
not realizing that a form requiring her signature was attached to an email. (Green Dep., Ex. 3
at 8–17.) Plaintiff experienced a "consistent problem" with receiving her payments
throughout her time at VSU. (*Id.* at 11.) At various points throughout the email exchange, it
is unclear which corresponding party actually had Plaintiff's payment paperwork. (*Id.*;
Spencer Dep. 262:15–263:1.) Provost Hill arranged a meeting with the parties involved in
the exchange in order to address the payment delay issue. (Green Dep., Ex. 3 at 8–9.)

Plaintiff alleges that the VSU Provost's Office encouraged a student to file a complaint
against Plaintiff with the Office of Civil Rights (OCR) and then failed to support Plaintiff
through the OCR investigation. (2d Am. Compl. ¶¶ 98–99.) Plaintiff stated "I just assume"
when asked how she knew that Provost Hill was behind the student filing the complaint.
(Spencer Dep. 304:5–8.) Provost Hill was instrumental in the student being able to
participate in commencement exercises despite not having the requisite credit hours to
graduate. (*Id.* at 306:7–312:21.)

Plaintiff alleges that Provost Hill referred to her as a "troublemaker" and made a veiled threat against her, saying: "A wise person taught me a long, long time ago, that, 'If you get dragged into a game you do not wish to play, then play the end-game.'" (2d Am. Compl. ¶¶ 90, 94–97.) Plaintiff was told that Provost Hill called her a "troublemaker" but never personally heard him do so. The moniker was, however, used jokingly by her colleagues in the VSU faculty. (Spencer Dep. 264:15–265:8; Edwards Dep. 80:3–6.) The statement Plaintiff believed to be a veiled threat was utilized frequently by Provost Hill as a colloquialism for "just tell me what it is you want. I'm not going to play the game leading up to it." (Hill Dep. 239:2–6.)

Plaintiff contends that Defendants denied her request for a salary adjustment to the pay-level of Dial and Shackleford in September 2014. (2d Am. Compl. ¶¶ 103–111.)

Plaintiff also claims that Defendants failed to bar a student from taking Plaintiff's classes or take any action in response to a threat assessment Plaintiff submitted against a stalking student in August 2015. (2d Am. Compl. ¶ 117.) Upon receiving Plaintiff's information about the threat assessment, VSU forwarded it to the police. (Spencer Dep. 336:18–337:11.) The Vice Provost suggested that the class be taught by somebody other than Plaintiff, and Dr. Joyce Edwards ultimately taught the class. (Edwards Dep. 181:2–7.) Plaintiff did not request that VSU remove the student from her class in order to allow her to teach it nor did she request that VSU take any further action with respect to that student. (*Id.* at 180:17–181:18.)

Plaintiff further maintains that she was slated to give a speech during freshman orientation in January 2016, but Defendants removed her name from the list. (2d Am.

Compl. ¶ 118.) Plaintiff states that certain unidentified students told her that the VSU administration took her off a list of speakers. (Spencer Dep. 355:4–358:20; Edwards Dep. 70:11–72:6.)

## II.   STANDARD OF REVIEW

The standard of review for summary judgment motions is well settled in the Fourth Circuit. Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 411 U.S. 242, 247 (1986); Fed. R. Civ. P. 56(c). The relevant inquiry in a summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 411 U.S. at 251–52. In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party. *Id.* at 255.

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. Indeed, summary judgment must be granted if the nonmoving party "fails to make a showing sufficient to establish the

existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

To defeat an otherwise properly supported motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, "mere speculation," the "building of one inference upon another," the "mere existence of a scintilla of evidence," or the appearance of "some metaphysical doubt" concerning a material fact. *Lewis v. City of Va. Beach Sheriff's Office*, 409 F. Supp. 2d 696, 704 (E.D. Va. 2006) (citations omitted). The court cannot weigh the evidence or make credibility determinations in its summary judgment analysis. *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004).

In analyzing motions for summary judgment, it is important to keep in mind that a material fact is one that might affect the outcome of a party's case. *Anderson*, 477 U.S. at 248; *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248; *see also Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" issue concerning a material fact only arises when the evidence, viewed in the light most favorable to the nonmoving party, is sufficient to allow a reasonable jury to return a verdict in that party's favor. *Anderson*, 477 U.S. at 248.

## III.    DISCUSSION

A.    **Plaintiff's Wage Discrimination Claim under the EPA**

1.    **Legal Framework**

The EPA prohibits employers from discriminating on the basis of sex "by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1).

To establish a prima facie case of wage discrimination under the EPA, a plaintiff bears the burden of showing: "(1) that her employer has paid different wages to employees of opposite sexes; (2) that said employees hold jobs that require equal skill, effort, and responsibility; and (3) that such jobs are performed under similar working conditions." *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 613 (4th Cir. 1999) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)), *overruled on other grounds by Desert Palace v. Costa*, 539 U.S. 90 (2003). This disparity is typically shown by a "factor-by-factor" comparison to a specific male comparator. *Houck v. Va. Polytechnic Inst. and State Univ.*, 10 F.3d 204, 206 (4th Cir. 1993).

A proper comparator for EPA purposes performs work "substantially equal" to that of the plaintiff. *Wheatley v. Wicomoco Cty.*, 390 F.3d 328, 332 (4th Cir. 2004) (citations and internal quotation marks omitted). Though "application of the [EPA] is not restricted to identical work," *Brennan v. Prince William Hosp. corp.*, 503 F.2d 282, 291 (4th Cir. 1974), "the jobs involved should be *virtually* identical, that is . . . very much alike or closely related to each other." *Wheatley*, 390 F.3d at 333 (quoting *Brennan v. City Stores, Inc.*, 479 F.2d 235, 238 (5th Cir. 1973) (emphasis added and internal quotation marks omitted)). This requires more than a mere showing that the plaintiff and the putative comparator share the same job title. *Wheatley*, 390 F.3d at 332. The analysis turns on whether the jobs to be

compared share a "common core" of tasks. *Hassman v. Valley Motors, Inc.*, 790 F. Supp. 564, 567 (D. Md. 1992) (cited for this proposition with approval in *Dibble v. Regents of Univ. of Md. Sys.*, 1996 WL 350019, at *3 (4th Cir. 1996) (unpublished opinion)).

However, "jobs do not automatically involve equal effort or responsibility even if they 'entail most of the same routine duties.'" *Wheatley*, 390 F.3d at 333 (quoting *Hodgson v. Fairmont Supply Co.*, 454 F.2d 490, 493 (4th Cir. 1972)). The Fourth Circuit has expressly declined to hold that jobs entail substantially equal work merely because the positions share similar titles and generalized responsibilities. *Id.* at 334. "Skill" for EPA purposes includes "such factors as experience, training, education, and ability." 29 C.F.R. § 1620.15(a); *see also Hassman*, 790 F. Supp. at 567–68. Even jobs that do share a common core of tasks may be considered unequal if the more highly paid job involves additional tasks requiring extra effort or time or contributes "economic value commensurate with the pay differential." *Hodgson*, 454 F.2d at 493 (quoting *Hodgson v. Brookhaven Gen. Hosp.*, 436 F.2d 719, 725 (5th Cir. 1970)).

If a plaintiff successfully establishes a prima facie case of wage discrimination, the burden of production and persuasion shift to the defendant to prove by a preponderance of the evidence that the wage disparity was caused by an enumerated statutory defense. *Brinkley-Obu v. Hughes Training*, 36 F.3d 336, 344 (4th Cir. 1994). These affirmative defenses include: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex" 29 U.S.C. § 206(d)(1). Should the defendant prove one of these defenses, "the plaintiff's claim must fail unless plaintiff can satisfactorily rebut the defendant's evidence." *Strag v. Bd. of Trustees*, 55 F.3d 943, 948 (4th Cir. 1995).

## 2.    Analysis

Even viewing the record in the light most favorable to Plaintiff, she has failed to establish a prima facie violation under the EPA.  Plaintiff, a tenured Associate Professor in the Department of Sociology, asserts that Dial, a term-appointed Associate Professor in the Department of Mass Communications, and Shackleford, a term-appointed Associate Professor in the Department of Educational Leadership, are proper comparators for her EPA claim.  While the positions held by Plaintiff and Dial are housed in different departments within the College of Humanities and Social Services, Shackleford's position is in both a different department and a different college—the College of Education.  Notwithstanding the differences in both department and college, Plaintiff contends that she and the two alleged comparators all shared the same routine tasks.  In support of this contention, Plaintiff identifies various shared duties, including "prepar[ing] syllabi which reflect course objectives . . . manag[ing] classroom dynamics . . . [and] provid[ing] feedback on assignments."  (Mem. Opp. Mot. Sum. J. 13.)

Defendants argue that Plaintiff has failed to establish a prima facie case, because she does not identify appropriate comparators.  Specifically, Defendants contend that the Dial and Shackleford taught different subjects in different departments, which entailed distinctive skill, effort and responsibility, and that Plaintiff's attempts at comparison are overly generalized.  Defendants also argue that Dial and Shackleford performed additional duties through their respective roles with internships and the doctoral program.

At the outset, the Court notes that differences in departmental affiliation between Plaintiff and the two VSU employees she identifies does not, as a matter law, prevent those employees from being proper comparators.  However, the Fourth Circuit has considered

differences in departmental affiliation, despite equality of rank, as a factor weighing against a finding that jobs require equal skill, effort, and responsibility. *See Strag*, 55 F.3d 943; *Soble v. University of Maryland*, 778 F.2d 164 (4th Cir. 1985). The reasoning behind consideration of this factor is that "different departments in universities require distinctive skills that foreclose any definitive comparison for purposes of the Equal Pay Act." *Strag*, 55 F.3d at 950 (citing *Soble*, 778 F.2d 164). Indeed, "rare would be the case where a university professor can demonstrate that a professor from a different department is a valid EPA comparator." *Earl v. Norfolk State Univ.*, No. 2:13cv148, 2016 U.S. Dist. LEXIS 35171, at *14–15 (E.D. Va. Mar. 17, 2016).

Further, the EPA requires more than merely examining job duties at a high level of generality. *See Wheatley*, 390 F.3d at 333. In *Wheatley*, plaintiff, a department head, provided as a comparator the head of another department and asserted that the two positions shared the same supervisory duties such as "prepar[ing] budgets, monitor[ing] employees, and conduct[ing] meetings." *Id.* at 332. The Fourth Circuit, in affirming the district court's ruling that plaintiff did not identify proper comparators, noted that "the EPA demands more than a comparison of job functions from a bird's eye view." *Id.* at 333.

Rather than provide the Court with evidence that Dial's and Shackleford's positions were functionally equal to hers in spite of the departmental differences, Plaintiff rests on the same type of overly generalized depiction of shared duties that the Fourth Circuit counseled against in *Wheatley*. 390 F.3d at 333. Accepting such a broad formulation would turn the exception into the rule, rendering nearly every professor in a university as an appropriate comparator for EPA purposes, and stand in stark contrast to Fourth Circuit precedent. *Strag*, 55 F.3d 943; *Soble*, 778 F.2d 164.

Moreover, the record in this case makes clear that the functions performed and the skills required in the positions held by Dial and Shackleford varied significantly from those of Plaintiff. Dial possesses a bachelor's degree in Communication Science, a MBA, and both a master's degree and a doctoral degree in Education. His professional background outside of academia includes nearly thirty years in the Army, where he held several different public relations positions and achieved the rank of Full Colonel, and nearly ten years in the VSU administration as the Director of Residence Life and Chief of Staff. The Department of Mass Communications, which Dial joined, emphasizes professional experience and touts its faculty as having professional expertise in numerous areas including public relations. Dial's extensive professional background enhanced his credentials and contributed to his performance of his day-to-day job responsibilities, including promoting the department to the various institutions at Fort Lee. A requirement for one of the department's degrees was completion of an internship, and Dial served as the coordinator of the department's internship program—a position that required him to develop, maintain and review internship sites.

Shackleford possesses a bachelor's degree in Business Administration, a MBA, and a doctoral degree in Education, which included a dissertation on the impact of remedial math at HBCU's. Shackleford's professional background included several years in the Army, where he served in multiple leadership positions, and also various positions within the VSU administration, including Executive Director of Enrollment Management and Vice President for Student Affairs and Enrollment Management. The Department of Educational Leadership, which Shackleford joined, focuses on providing students with the skills necessary to efficiently and effectively assume administrative responsibilities. He similarly maintained a significant role in the department's internship program. Shackleford only taught graduate-

level courses within the department's doctoral program, which allows students to earn a Doctorate of Education in Educational Administration and Supervision. His position required him to spend significant time assisting students in the dissertation phase of their doctorate.

Plaintiff does not suggest that she has served in the administration of a university or that she has an extensive relevant professional background outside academia, nor does she suggest that her position included a significant role with internships or the supervision of students' dissertations. Plaintiff instead directs the Court's attention to portions of the record that suggest overseeing internships and doctoral programs is the "same as teaching a class." (Mem. Opp. Sum. J. ¶¶ 32–33; *see* Dial Dep. 199:18–200:8; Shackleford Dep. 132:9–133:3.) While Plaintiff successfully demonstrates that such duties were not additional to the comparators' generic responsibilities as associate professors, she fails to grasp a significant distinction. When the positions are examined at a lesser degree of abstraction, the functional responsibilities that comprised "teaching a class" and the skillset required in doing so varied across all three departments.[3] *See Wheatley*, 390 F.3d at 334 ("[D]eclin[ing] to hold that having a *similar* title plus *similar* generalized responsibilities is equivalent to having *equal* skills and *equal* responsibilities.").

Finally, the regression analysis performed by Dr. Joseph I. Rosenberg, Plaintiff's own expert, makes clear that VSU did not suffer from systemic, gender-related wage disparity. While the lack of systemic discrimination, standing alone, may not be sufficient to disprove

---

[3] Plaintiff produces a significant record detailing how the hiring of Shackleford and Dial deviated from the procedures used in hiring most faculty members. She also contends that Dial and Shackleford did not meet the qualifications required for their respective positions. However, the EPA does not empower courts to assess the virtue of every personnel decision, only whether such decision was made in a discriminatory fashion. *See Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272 (4th Cir. 2005) ("[Courts] do not sit as a super-personnel department weighing the prudence of employment decisions made by defendants." (citations and internal quotation marks omitted)). The Court's inquiry focuses on comparing the jobs held by Dial and Shackleford to that held by Plaintiff, not assessing the wisdom of VSU's decision to hire Dial and Shackleford into those positions.

an EPA violation, the Fourth Circuit has found the "absence of systemic discrimination . . . combined with . . . improper identification of a male comparator" suggests a failure to establish a prima facie case. *Strag*, 55 F.3d at 950. Dr. Rosenberg found that both "comparators" were overpaid in comparison to their peers, but, importantly, he also found that those peers included both male and female faculty members. Further, Dr. Rosenberg stated that his analysis did not show a "statistically significant level" of male faculty at VSU being paid more than their female counterparts by school. This comports with the fact that, in comparison to faculty of equal rank within her own department, Plaintiff's salary is the same as that of one male professor, higher than those of one male and one female professor, and lower than those of one male and one female professor.

Based upon the foregoing information, the Court finds that Plaintiff has failed to establish a prima facie case under the EPA.

Even if Plaintiff could establish a prima facie case under the EPA, Defendants have successfully identified a compelling "factor other than sex" defense within the meaning of 29 U.S.C. § 206(d)(1). The record is clear that VSU utilized a "simple arithmetic calculation" in setting the salaries of Shackleford and Dial as Associate Professors at 75% of their prior salaries as administrators. Moreover, VSU had previously applied this calculation to other administrators it moved to academic faculty positions. Plaintiff does not dispute these facts nor does she contend that she previously held an administrative position that would entitle her to a similar salary calculation.[4] Instead, she asserts that prior salary alone cannot justify a pay

---

[4] Plaintiff attempts to cabin the practice to "retreat rights" whereby an administrator can *return* to a previously held faculty position without losing the administrative salary. She argues that VSU did not have a policy of transitioning non-renewed administrators that did not previously have tenure to faculty positions at their administrative salary level. However, Plaintiff does not dispute that Provost Hill believed he was following past practice of VSU and the norm in higher education across the Commonwealth in transitioning Dial and

disparity under the EPA. This Court's research yields no Fourth Circuit authority supporting Plaintiff's contention.

While some courts do require that an employer hiring a new employee point to business reasons that "reasonably explain" the use of prior salary, *see, e.g., Irby v. Bittick*, 44 F.3d 949, 955–56 (11th Cir. 1995), other courts such as the Seventh Circuit have found that an employer moving an employee to another position may properly consider that employee's previous salary set by the same employer unless such a policy is applied in a discriminatory fashion or independent evidence establishes that the employer discriminates on the basis of sex when doing so. *See Covington v. S. Ill. Univ.*, 816 F.2d 317, 322–23 (7th Cir. 1987); *Earl*, 2016 U.S. Dist. LEXIS 35171, at *7; *Grove v. Frostburg Nat'l Bank*, 549 F. Supp. 922, 937 (D. Md. 1982).

In a situation such as this case, where the defendant seeks to hire a current employee to a new position while retaining the employee's previous salary level, the Court believes that the approach taken by the Seventh Circuit is appropriate. And, while a facially gender-neutral compensation practice such as this still has the potential to be applied in a discriminatory manner, Defendants clearly did not do so here. In contrast to Dial and Shackleford, Plaintiff never held an administrative position, and therefore Defendants could not have set her salary as a percentage of a prior administrative salary. Therefore, because the alleged comparators' salaries were set using their prior salary set by Defendant VSU and there is no indication that the practice was used to discriminate, the Court finds that

---

Shackleford to faculty positions nor does she argue that Provost Hill knowingly misapplied the salary-retention policy. Therefore, even accepting Plaintiff's characterization of the practice as true, the unnecessary application of the practice impacts the wisdom of the business decision, not its validity under the EPA. *See Smith v. Univ. of N.C.*, 632 F.2d 316, 346 (4th Cir. 1980) ("[T]he law does not require, in the first instance, that employment be rational, wise, or well-considered—only that it be nondiscriminatory." (internal citations omitted)).

Defendants have successfully established a credible "factor other than sex" justification.

Even applying the more restrictive approach, Defendants still satisfy the "factor other than sex" requirement because they identify business reasons that "reasonably explain" using the comparators' prior salary. Namely, Defendants cite portions of the record that make clear Provost Hill set the comparators' salaries not only based upon VSU's past practice of transitioning administrators to faculty positions, but also based upon the practice of institutions of higher education across the Commonwealth. For these reasons, the Defendants have successfully established an affirmative defense to Plaintiff's EPA claim.[5]

Based upon Plaintiff's failure to establish a prima facie case and Defendants' ability to successfully establish an affirmative defense in the event that a prima facie case was found, the Court dismissed Plaintiff's EPA claims, found in Counts I and III of her Second Amended Complaint.

## B.    Plaintiff's Wage Discrimination Claim under Title VII

### 1.    Legal Framework

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 USC § 2000e-2(a)(1). In examining Title VII claims, courts employ a burden-shifting scheme whereby a plaintiff first bears the burden of establishing a prima facie case, then the defendant bears the burden of presenting a legitimate, non-discriminatory reason for its employment action, and finally the plaintiff bears the

---

[5] Plaintiff does not argue and the record does not show that the use of the comparators' prior salaries was a pretext to discriminate.

burden of showing that the explanation proffered by the defendant was merely a pretext. *See*

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Taylor v. Virginia Union*

*Univ.*, 193 F.3d 219, 230 (4th Cir. 1999).

The sex discrimination provisions of Title VII and the EPA are construed in harmony.

*Williams v. Cerberonics, Inc.*, 871 F.2d 452, 455 (4th Cir. 1989). A wage discrimination

claim under Title VII can be proved through direct or circumstantial evidence. *Brinkley-Obu*,

36 F.3d at 343. Under the circumstantial evidence framework, a plaintiff may establish a

prima facie case of disparate treatment by demonstrating that: "she is female, i.e., a member

of a protected class, and that the job she occupied was similar to higher paying jobs occupied

by males." *Id.* (citing *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1526 (11th

Cir. 1992)). The Fourth Circuit has suggested that a Title VII disparate treatment claim

employs a "relaxed standard of similarity between male and female-occupied jobs" in

comparison to an EPA claim. *Id.* However, a plaintiff in a Title VII claim bears the

additional "burden of proving an intent to discriminate on the basis of sex." *Id.*

Should a plaintiff successfully state a prima facie case, the burden of production shifts

to the defendant to show that the employment decision was made for a non-discriminatory

reason. *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 285 (4th Cir. 2004). The

affirmative defenses provided for under the EPA, *see supra* pp. 15–16, are incorporated into

Title VII. 42 U.S.C. § 2000e-2(h); *Cty. of Wash. v. Gunther*, 452 U.S. 161, 168 (1981); *see*

*McDougal-Wilson v. Goodyear tire & Rubber Co.*, 427 F. Supp. 2d 595, 604 (E.D.N.C.

2006). In the event that the defendant successfully establishes an affirmative defense, the

plaintiff can only prevail by showing that the defendant's proffered explanation was mere

pretext and "that the defendant was actually motivated by discriminatory intent." *Brinkley-Obu*, 36 F.3d at 344.

## 2. Analysis

Much like her EPA claim, Plaintiff's Title VII claim evolves from the 2014 appointment of Dial and Shackleford to the faculty at greater salaries than her own and VSU's subsequent denial of her salary increase request in the same year. (2d Am. Compl. ¶¶ 133–37.) For the reasons described above in relation to her EPA claim, Plaintiff has failed to identify appropriate comparators that would allow the Court to determine that she received less pay than men in similar positions.

Even applying a "relaxed standard of similarity" to Plaintiff's Title VII claim and accepting Dial and Shackleford as appropriate comparators, she has still failed to carry her burden of showing a discriminatory intent. Plaintiff's reliance on derogatory comments that Provost Hill made about her well over a year prior and in a context unrelated to her request for a pay raise is unavailing. *See Hill*, 354 F.3d at 286 (noting that "statements . . . unrelated to the decisional process itself [do not] suffice to satisfy the plaintiff's burden of proving discrimination" (internal quotations omitted)). Plaintiff also cites the fact that Provost Hill had received her report on gender-related pay disparity at VSU when he set Dial and Shackleford's salaries. However, this merely suggests that Provost Hill did not follow the recommendations made in Plaintiff's report. Lastly, Plaintiff directs the Court to the opinion of Dr. Joyce Edwards that Provost Hill was vindictive to both men and women, but more so to women.[6] This generalized opinion, to the extent that it is admissible, is insufficient to

---

[6] Dr. Edward's testimony also identifies sexist comments that Provost Hill allegedly made to three unidentified male colleagues in the context of Dr. Edwards becoming a department chair. (Edwards Dep. 61:17–63:7.)

establish that Provost Hill acted with a discriminatory intent in denying Plaintiff's request for a salary increase. Plaintiff asks the Court to draw inferences from evidence that is either unrelated or irrelevant to the employment decision at issue. Plaintiff has simply failed to demonstrate a prima facie claim of a discriminatory intent.

Notwithstanding Plaintiff's failure to carry her initial burden, the undisputed record would be more than sufficient to rebut a prima facie case. As identified above with regard to Plaintiff's EPA claim, Defendants successfully established "factor[s] other than sex" that justify their actions. Those factors include the use of a sex neutral equation to set the comparators' salaries at 75% of their previous administrative salary, VSU and the other institutions of higher education in the Commonwealth following this established salary-retention practice, and the comparators' vast professional experience and contributions as associate professors.

Dr. Edwards, who personally recommended that Plaintiff receive a salary increase, also acknowledged that the denial was due to VSU's concern that granting an increase in Plaintiff's case would lead to a domino effect amongst all faculty members of that rank. VSU denied Plaintiff's request for a salary increase after determining that Plaintiff's salary was squarely in the middle of similarly ranked faculty—both male and female—within her department. The VSU administration took steps to remedy the concerns raised by Plaintiff's report on gender-related pay disparity by allocating over $450,000 for pay increases. Moreover, in the two years preceding Plaintiff's request for a salary increase, Provost Hill, whom Plaintiff relies on to show intentional discrimination, approved both Plaintiff's request

---

Not only were these statements made more than two years prior and in a context unrelated to the decisional process, they are also inadmissible hearsay that the Court cannot consider. *Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

to spend a semester teaching in China while receiving her regular salary and a $10,000 stipend and Plaintiff's request for tenure.

This context shows that Defendant had a valid, non-discriminatory reason for its decision, and it undermines Plaintiff's contentions to the contrary. Further, Plaintiff has failed to make any credible showing of pretext in rebuttal. Accordingly, Plaintiff's Title VII claim found in Count IV of her Second Amended Complaint was dismissed.

## C.  Plaintiff's Retaliation Claim Under the EPA and Title VII

### 1. Legal Framework

"The antiretaliation provision [of the EPA] seeks to secure [the] primary objective [of promoting a workplace where individuals are not discriminated against because of their sex] by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). To properly state a retaliation claim under the EPA and Title VII, a plaintiff is required to show: (1) that she engaged in a protected activity; (2) that Defendants took some adverse employment action against her; and (3) that a causal connection existed between the protected activity and the adverse action.[7] *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989) (citing *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985)). Much like with a wage discrimination claim under Title VII, once a plaintiff establishes a prima facie case the burden shifts to the defendant to "proffer evidence of a legitimate, nondiscriminatory reason for taking the adverse employment action." *Spriggs*

---

[7] The Court observes that the same standard is utilized for assessing both EPA and Title VII retaliation claims. *See Kennedy v. Va. Polytechnic Inst. & State Univ.*, 781 F. Supp. 2d 297, 303 (W.D. Va. 2011); *Harrison v. Principi*, Civil Action No. 3:03-1398, 2005 WL 4074516, at *7 (D. S.C. Aug. 31, 2005).

*v. Diamond Auto Glass*, 242 F.3d 179, 190 (4th Cir. 2001).

For a plaintiff to establish that she engaged in a protected activity in satisfaction of the first element, she must show that she "has filed any complaint or instituted or caused to be instituted any proceeding under or related to" the EPA. 29 U.S.C. § 215(a)(3). The Fourth Circuit has noted that the term protected activity "encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).

With regard to the second element, the Supreme Court has held that a materially adverse employment action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (citations and internal quotation marks omitted)).

A materially adverse employment action does not include—and the law cannot immunize an employee from—"those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* Courts must conduct a fact-specific analysis in each case to determine whether an employer's actions would have deterred a reasonable employee from seeking protection under the EPA. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."); *see also Burlington Northern*, 548 U.S. at 69 ("[A] legal standard that speaks in general terms rather than specific prohibited acts is preferable, for an 'act that would be immaterial in some situations is material in others.'" (quoting *Washington v. Illinois Dept. of*

*Revenue*, 420 F.3d 658, 661 (7th Cir. 2005)).

So, for example, "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." *Burlington Northern*, 548 U.S. at 69 (citing *Washington*, 420 F.3d at 662 (finding that a "flex-time" schedule was critical to an employee with a disabled child)). Similarly, "[a] supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." *Id.*

In order to satisfy the third and final element of a retaliation claim, a plaintiff must plausibly allege that her employer took a materially adverse employment action "*because* the plaintiff engaged in a protected activity." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998). Stated succinctly, a plaintiff must plead a plausible causal connection between the first and second elements.

In the absence of direct evidence, temporal proximity between the protected activity and the adverse employment action can give rise to an inference of causation. *See Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007). The Fourth Circuit has suggested that a two-and-a-half month gap between the protected activity and the adverse employment action may be sufficient to weaken an inference of causation based on temporal proximity alone. *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003); *see also Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal

proximity must be very close." (internal quotation marks and citation omitted)); *Dowe*, 145 F.3d at 657 ("A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two."). In the absence of close temporal proximity, other evidence of "retaliatory animus" from the intervening period may be used to prove causation. *Lettieri*, 478 F.3d at 650.

### 2. Analysis

At the outset, the Court notes that Plaintiff provides limited citations to the record in support of her retaliation claims. The Court is not inclined to scour the record in search of facts that Plaintiff could potentially cite to dispute Defendants' stated record. Plaintiff rests her retaliation claims "on the cited evidentiary materials." (Mem. Opp. Sum. J. 30.) In line with Federal Rule of Civil Procedure 56 and Plaintiff's own averments, the Court will confine its analysis to the record cited. On that record, the Court finds that Plaintiff has failed to state a prima facie claim of retaliation.

The record shows that Plaintiff engaged in two instances of protected activity that could potentially serve as the basis for a retaliation claim: she presented the VSU administration with a report on gender equity at VSU in April 2012, and she gave a copy of the report to VSU Board Member Terone Green in November 2012.[8]

---

[8] Plaintiff's Memorandum in Opposition identifies two additional instances of protected activity—the April 2015 filing of a complaint before the Equal Employment Opportunity Commission and the May 2015 filing of her initial EPA complaint. The Court need not consider these instances of protected activity because, as seen below, no materially adverse employment actions occurred after 2014.

With these instances of protected activity in mind, the Court turns to the second element. Plaintiff identifies seven incidents of alleged retaliation;[9] however, it is unclear from her Complaint or Memorandum in Opposition whether she contends that each incident is a discrete materially adverse employment action or merely evidence of a pervasive retaliatory animus necessary to prove causation. Each of these incidents is addressed below.

a. *Hill's intentional delay signing paperwork for summer school pay in May of 2012*

Although a delay in payment could, in the abstract, constitute an action that would dissuade a reasonable employee from challenging a discriminatory action, Plaintiff does not direct the Court to any evidence establishing that the delay was intentional or at all attributable to the VSU administration or Provost Hill. Moreover, the record establishes that the delay was caused by the chair of Plaintiff's department inadvertently missing a submission deadline. The president of VSU suspended electronic deposit for the entire faculty in an attempt to accommodate Plaintiff. Thus, there is no evidence that the delay was either intentional or caused by Provost Hill and the VSU administration as Plaintiff alleged.

b. *Hill's intentional delay signing paperwork for overload pay in December of 2012*

In support of Plaintiff's speculation that Provost Hill was responsible for this delay in payment, she directs the Court to: 1) contemporaneous, derogatory comments made by Provost Hill about Plaintiff; 2) testimony that Hill signed paperwork preferentially; and 3) testimony that Hill and VSU had a general culture of retaliation.

The lengthy email exchange between various parties in the VSU bureaucracy attempting to resolve Plaintiff's payment issue makes clear that the initial delay in Plaintiff's

---

[9] To the extent that Plaintiff's Complaint identifies other incidents not addressed here, Plaintiff has failed to identify for the Court any evidence that would support her claims that such incidents occurred.

payment was attributable to Plaintiff's department chair again inadvertently failing to timely submit the required paperwork. This email exchange also shows that Provost Hill arranged a meeting in early January 2013 to address the delinquent payments with the relevant parties. For her part, Plaintiff's own testimony confirms that it was unclear which corresponding party actually had her paperwork. Moreover, Plaintiff's own email in the exchange reveals that timely receipt of payments was a "consistent problem" she experienced in multiple semesters at VSU predating her asserted protected activity.

Plaintiff therefore does not identify any evidence showing that Provost Hill or the VSU administration intentionally delayed signing her paperwork in retaliation for her actions. Instead, she urges the Court to craft a mosaic of inferences to reach such a conclusion. The record evidence clearly reveals that the initial delay in Plaintiff's payment was inadvertent and attempts to take corrective action were unfortunately unavailing. The Court does not discount the frustration that this incident caused, but the retaliation provisions of the EPA and Title VII do not immunize an employee from every inconvenience that she may experience in the course of her employment. Again, the record is devoid of any factual basis to attribute such delay to gender-based animus.

c.     *VSU's failure to assist Plaintiff with a formal discrimination complaint in May 2013*

Plaintiff fails to identify any evidence demonstrating that the VSU administration was responsible for a student filing a formal discrimination claim against her with the Office of Civil Rights ("OCR") or that the degree of support she received from VSU during the ensuing investigation differed from that given to similarly-situated faculty members. She attempts to link Provost Hill to the OCR complaint through his subsequent granting of an accommodation for the student who made the complaint, which allowed that student to

participate in graduation proceedings. However, Plaintiff's own testimony confirms that she "just assume[d]" somebody in the Provost office was responsible for the complaint. Such assumptions fall short of the mark.

d.   *Hill's communications with Plaintiff*

Plaintiff was told that Provost Hill called her a "troublemaker" but never heard him do so. Plaintiff's colleagues, however, jokingly referred to her by the term. Additionally, Provost Hill explained that a comment Plaintiff regarded as a veiled threat was actually a colloquialism he frequently used to say "just tell me what it is you want. I'm not going to play the game leading up to it." The Court is hesitant to conclude that a reasonable employee would be discouraged from challenging discriminatory conduct based on these statements. Moreover, Plaintiff does not direct the Court to any portion of the record that shows a causal connection between these statements and any protected activity.

e.   *VSU's denial of Plaintiff's salary increase in September of 2014*

Based on the record at hand pertaining to Plaintiff's EPA and Title VII claims, it is clear that the denial of Plaintiff's request for salary adjustment constituted a materially adverse employment action. Plaintiff, however, fails to show that the denial was causally connected to any form of protected activity.

The denial of Plaintiff's salary increase occurred nearly two years after Plaintiff last engaged in protected activity. Therefore, the temporal proximity between Plaintiff's protected activity and the denial of the salary increase is insufficient to produce an inference of causation on its own. Thus, Plaintiff must rely on additional evidence of a "retaliatory animus." The incidents described above, even when aggregated, do not rise to that level. In *Lettieri*, a female employee complained to her human resources department about gender

discrimination by her superiors. 478 F.3d at 650–51. Following this, the plaintiff was relieved of her job responsibilities, divested of control over the sales team, and prohibited from setting prices and meeting directly with important clients. *Id.* The Fourth Circuit concluded that "[t]hese intervening events—which occurred regularly after Lettieri's complaint and can reasonably be viewed as exhibiting retaliatory animus on the part of [defendants]—are sufficient to show a causal link between Lettieri's complaint and her termination." *Id.* at 651. The immediate case at hand is easily distinguishable.

Here, three of the incidents Plaintiff identifies—the two delayed payments and the OCR complaint—were either not attributable to Defendants, resolved expeditiously, or both, and therefore cannot establish a retaliatory animus. The "troublemaker" comment and the email sent by Provost Hill that Plaintiff viewed as a veiled threat at best represent a strained personal relationship that is similarly insufficient to show retaliatory animus.

Even if these incidents were sufficient to support an inference of retaliation, Defendants have identified a non-discriminatory reason for denying this salary increase that would be sufficient to rebut a resulting prima facie case. As described above with regard to Plaintiff's EPA and Title VII claims, Shackleford and Dial were retained at 75% of their administrative salaries based upon Provost Hill's understanding of VSU's practice and the general practice of institutions of higher education within the Commonwealth of Virginia. Plaintiff had no administrative history that would allow for a similar calculation.

*f.     VSU's failure to address Plaintiff's concerns about a troubled student in August of 2015*

After receiving Plaintiff's threat assessment of a troubled student, VSU forwarded the information to the campus police. In addition, the VSU administration suggested that another

faculty member teach the class with the troubled student. Ultimately, the chair of Plaintiff's department taught the class, and Plaintiff did not request that VSU take any further action. The record does not show anything adverse to Plaintiff stemming from VSU's handling of this situation.

g.     *VSU's prevention of Plaintiff giving a freshman orientation speech in January of 2016.*

Plaintiff states that certain unidentified students told her that the VSU administration took her off a list of speakers for freshman orientation. The Court cannot consider these inadmissible statements in ruling on summary judgment since the declarants were neither identified nor subject to examination. *Greensboro Prof'l Fire Fighters*, 64 F.3d at 967. Consequently, Plaintiff has failed to establish that she suffered any arguable adverse employment action in January 2016, let alone a material one.

Because these incidents do not rise to the level of actionable retaliation, either individually or collectively, Plaintiff's retaliation claims in Counts II and V of her Second Amended Complaint were dismissed for lack of evidentiary support.

## IV.    CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment (ECF No. 74) was granted as to all counts.

The Clerk is DIRECTED to send a copy of this Memorandum Opinion to all counsel of record.

                                        /s/
                                        _____

                                        Henry E. Hudson
                                        United States District Judge

Date: Jan. 30, 2018
Richmond, VA